IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MICHAEL E. COLLINS, | ) | No. C 13-1371 JSW (PR) |
| | ) | |
| Petitioner, | ) | **ORDER DENYING PETITION FOR** |
| | ) | **WRIT OF HABEAS CORPUS;** |
| vs. | ) | **DENYING CERTIFICATE OF** |
| | ) | **APPEALABILITY** |
| CALIFORNIA DEPARTMENT OF | ) | |
| CORRECTIONS, | ) | |
| | ) | (Docket No. 56) |
| Respondent. | ) | |
| | ) | |

## INTRODUCTION

Petitioner a prisoner of the State of California filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the validity of his criminal conviction and sentence in state court. Respondent filed an answer to the petition, to which Petitioner filed a traverse. For the reasons set forth below, the petition is DENIED.

## BACKGROUND

In 2010, a jury found Petitioner guilty of first-degree murder. (Cal. Pen. Code § 187(a).) He was sentenced to a state prison term of 25 years-to-life, plus two consecutive terms of one year each on sentence enhancements for using a knife and a prior prison term. The California Court of Appeal affirmed the judgment on appeal except for reversing the sentence enhancement for the prior prison term, and also

1   separately denied a habeas petition.  The California Court of Appeal subsequently

2   modified its opinion on December 8, 2011.  On February 15, 2012, the California

3   Supreme Court denied a petition for direct review.  Petitioner filed two habeas petitions

4   in the California Supreme Court; one was denied in 2012, and the other was denied in

5   2014.

6       The California Court of Appeal summarized the evidence presented at trial as

7   follows:

> Belinda Johnson (Johnson) and appellant began dating in 2001; within six months they began living together. Johnson's adult daughters, Cynthia Johnson (Cynthia) and Caressa Smith, lived with them. Appellant and Johnson's daughter (Daughter) was born in 2003. Appellant and Johnson broke up more than once; and, before Daughter was born, appellant moved out of their home. Appellant and Johnson began living together again after Daughter's birth.
>
> Between February 1, 2006, and July 25, 2007, appellant was in custody for assaulting Cynthia. While in custody, he was in Santa Rita Jail, Napa State Hospital, and Atascadero State Hospital. While appellant was in custody, Johnson began dating Sam Hayes, an old boyfriend.3 Johnson visited appellant in jail four or five times. Although appellant said he wanted to get back together with her, she did not intend to get back together with him. It was understood that, upon his release from custody, he would not be moving back into her home.
>
> When appellant was released from custody he did not know that Johnson was dating Hayes. Thereafter, when Johnson and Daughter visited appellant at his mother's house, Johnson told him she was dating someone. He responded, "That's okay because I'm dating someone too," and showed her a picture of a woman on his cell phone. Johnson left the meeting thinking she and appellant would be friends for the sake of Daughter and get along.
>
> In early August 2007, Johnson met appellant in an Oakland motel and they had sex. She told him afterward that she regretted it. On August 15, Johnson went to Reno with appellant for two nights. They fought a lot while in Reno, mostly because Johnson wanted to go home. When appellant told Johnson they should get back together, she said that would not happen. Appellant became very angry and said he wanted her to "leave [Hayes] alone" and live together with appellant and Daughter like they did before appellant was jailed.
>
> After appellant and Johnson returned from Reno, they argued a lot on the phone, "cussing each other out." He continued to say they would work things out and get back together for the sake of Daughter. Johnson continued to spend time with Hayes and he would spend the night at her

home.

On or about August 29, 2007, appellant and Johnson were arguing on the phone; he was telling her she didn't want to be with Hayes and she needed to be with him. When she told appellant they were not going to be together anymore, he said "Watch it bitch. I'm going to make your life a living hell." On August 30, appellant and Johnson called each other throughout the day, "doing a lot of arguing," "cussing," and hanging up. That night, Hayes drove to Johnson's house and parked in front, close to her door. Appellant knew what Hayes's car looked like. Johnson and Hayes drank alcohol, smoked marijuana, and took ecstasy. They were having sex in Johnson's bedroom when appellant began cursing and knocking on the bedroom window and "beating on the door real hard." Appellant was cursing and said, "You stank ho. You in there fucking." Johnson told him to leave and said she was going to call the police. Johnson and Hayes went to the front door; Johnson told Hayes not to open it and not to fight appellant. By the time Hayes opened the door, appellant was gone. Johnson and Hayes decided they did not need to call the police.

Appellant then began calling Johnson's cell phone. Eventually she answered and they argued about his having come to her house. The next morning, August 31, 2007, appellant and Johnson argued on the phone and she told him to calm down. Subsequently, around noon, he called her cell phone and she told him he needed to relax, stop being so angry, and talk to someone. She told him she was not going to talk to him anymore and was turning off her phone. She then went back to bed, where Hayes was, and went to sleep.

When Johnson woke up, she saw appellant "charging" down her hallway. Appellant started running at her and pulled a knife from his waistband. Johnson yelled, "No, Mike" and screamed for Hayes to get up. She pushed a small table in front of appellant and continued to scream for Hayes to get up. Appellant jumped over the table, onto the bed and on top of Hayes. Johnson began pulling at appellant and telling him "No," while appellant was stabbing Hayes. Neither Hayes nor appellant spoke before appellant began stabbing him. While stabbing Hayes, appellant yelled "I told you I'm gonna get your ass."

Appellant got up and came down the hallway with the knife; Johnson ran outside and unsuccessfully tried to get help. She then grabbed her keys and a T-shirt and drove to Cynthia's house because that's where she thought appellant would go.4 After arriving at Cynthia's house, Johnson, Cynthia, Cynthia's two children, and Daughter drove back to Johnson's house. En route, Johnson called 911.

When Johnson arrived at her house, the police were there; Hayes had been transported to the hospital. The police had Johnson call appellant. When he answered she screamed, "Why did you do it?," and he responded "What? What did I do?," and acted as though nothing had happened. They then engaged in cursing and arguing. Johnson then called appellant's father's house and learned that appellant was there. Johnson talked on the phone with appellant while the police drove her to appellant's father's

3

house. Johnson identified appellant and he was taken into custody. At the time of his arrest, appellant had a two-inch laceration on the inside of his left wrist.

Police searched appellant's apartment. On top of the television in the bedroom, police found a sheathed folding knife with suspected blood on it. A loaded 12–gauge shotgun was found underneath the living room couch. A bloody shirt was found on top of a laundry basket. No blood, fingerprints or DNA were found on the sheath or knife. DNA testing of the blood-stained shirt revealed DNA from Hayes and appellant.
Hayes succumbed to his injuries nine days after the stabbing. The forensic pathologist who conducted the autopsy opined that the cause of death was brain death as a result of cardiac arrest due to multiple stab wounds. Hayes had nine stab wounds and two incised wounds. The stab wounds were to his back, thigh, arm, chest and abdominal cavity. He also had incised wounds to the fingers of both hands.

Johnson testified that prior to August 31, 2007, the screen on the window in her back room was intact and the window was kept propped open with a Raiders cup. However, after the murder, the window was propped open with a box of Top Ramen and the blinds were torn.

**The Defense**

Appellant testified in his own defense. He stated before Daughter was born, Johnson was agreeable to marrying him as long as he was working. On Daughter's second birthday, appellant proposed to Johnson, but they did not marry because he was not working. After his release from jail, and before he and Johnson went to Reno, he did not know she was dating Hayes. He denied telling Johnson prior to August 29, 2007, that he would make her life a living hell if she did not live with him, and denied ever threatening to kill her. As of that date, he was suspicious that she was seeing another man, but did not know for sure if she was. Since working as a "cable TV" lineman, he always wore a knife and sheath. In August 2007, he always carried the knife seized by police after the stabbing. He used it for working, camping, and peeling potatoes and apples.

Appellant said that around 11:00 p.m. on the night of August 30, 2007, he drove to Johnson's house to spend some time with her. As he walked up the staircase, he heard her having sex with another man. Appellant got upset and angry because he did not expect anyone to be there. He hit the window and said, "There you go. You haven't gotten over your whore work." He then turned around and left and drove to his father's house. He denied pounding on the door.

The next day appellant called Johnson and told her to have Daughter ready because he was coming to get her. When he arrived at Johnson's house at noon or 1:00 p.m., he used his keys to open the front door. He expected that the man who had been there the night before would no longer be there. Appellant saw Johnson standing at the bedroom window and then noticed a man sitting on the bed. When she saw appellant, she ran past him. As Johnson ran by, the man said to her, "Tell my children I love them."

4

The man pulled a knife from the side of the bed and appellant reached for his own knife. After the man charged appellant, appellant knocked the man's knife out of his hand and started stabbing him with it. Appellant did not recognize the man when he first saw him. Appellant then stopped stabbing him and said, "Oh, you got children? ... You should be where they at, not where I'm trying to raise mine." Appellant then said "God bless you," dropped the knife and left. At the time appellant did not know the man's name. Appellant did not use his own knife during the struggle with Hayes. Appellant knew he had stabbed Hayes a number of times, but did not know it was nine times. He did not consider the stab wounds he inflicted on Hayes to be life threatening.

After the stabbing, appellant removed his shirt because it had blood on it, then took BART and walked to his father's house. He did not tell his father what had happened. Johnson called, asking appellant "Why you do that?" Because he was in shock, he responded, "What's you talking about?" The police then arrived, arrested him and took him to the hospital for treatment of his injury. He "misspoke," telling police he was injured in a struggle with the police.

On cross-examination, appellant conceded that, in July 2007, he pled no contest to a February 2006 assault with force likely to inflict great bodily injury against Cynthia. However, he said he had no recollection of also pleading no contest to an assault on a custodial officer and misdemeanor battery against a custodial officer, or if he so pled he was not in a "conscious state of mind when [he] made the plea." Although he has suffered from seizures since 2002, he was seizure free in August 2007, including the day of the stabbing. He said that, while in Reno, Johnson agreed to move back in with him and marry him. Between the trip to Reno and August 30, appellant and Johnson were "doing just fine" and "still together."

Appellant said he was "very calm" when he walked to Johnson's house on the day of the stabbing. He didn't care if Hayes was there when he got there to pick up Daughter. Appellant "wasn't planning on starting no trouble." He used his keys to enter through Johnson's front door and began looking for Daughter. When he entered Johnson's bedroom, she screamed and ran past him. Hayes grabbed a knife and stabbed appellant's arm; appellant knocked it out of Hayes's hand. Appellant then picked up the knife and started stabbing Hayes. Appellant said he stabbed Hayes because he became angry after Hayes picked up the knife and approached him with it. Appellant was also angry because Hayes was naked in his house, with his woman and possibly Daughter.

**Rebuttal**

Oakland Police Sergeant Sean Fleming testified that, based on his experience with stabbing cases, suspects may be so violent during a stabbing that they stab themselves. Fleming also said that when he interviewed appellant after the stabbing, appellant referred to Hayes by his first name, Sam.

Cynthia gave detailed testimony regarding appellant's February 1,

5

2006 assault against her. She noted that he came through Daughter's bedroom window and said he wanted to get his "stuff" and was looking for his keys. Appellant said he was going to take a bath and put Daughter in the bathtub. Because he was sweating a lot and looked upset, Cynthia unsuccessfully tried to reach Johnson. Appellant started getting "loud" and said he wanted his keys. He then went to where Cynthia lay on the couch and started punching her in the nose and mouth. When she tried to defend herself, he kept hitting her and telling her it was "all [her] fault." When she tried to open the front door, appellant grabbed her hair. He then ripped the coffee table apart and started hitting her with it. He kept punching her and started to "smother" her with a pillow. He told her that she and her mother were going to die and he was going to beat her to death. When appellant tried to "slam the TV down on top of [her]," she broke free and ran into the kitchen, where he beat her, hit her with his knee, and threw things at her. Cynthia managed to jump out a window and a neighbor called the police.

*People v. Collins*, 2011 WL 6116473, *2-4 (Cal. Ct. App. Dec. 8, 2011).

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254 (d).  The first prong applies to both questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor,* 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations.  *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254 (d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently that [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13.  A state court

6

decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254 (d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions, but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. § 2254 (d)(2), a state court decision "based on a factual determination will not be overturned on factual  grounds unless objectively unreasonable in the light of the evidence presented in the state-court proceeding." *Miller-El,* 537 U.S. 332 at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

When there is no reasoned opinion from the highest state court to consider AEDPA's standard for relief has been met, the Court looks to the last state court to deny the claims in an explained opinion. *See Ylst v. Nunnemaker,* 501 U.S. 797, 801-06 (1991).

## DISCUSSION

Petitioner claims: (1) that the trial court denied bail without just cause at the preliminary hearing, which prevented him from obtaining private counsel and forced him to rely upon ineffective appointed counsel; (2) that his mental impairment at the time of his offense was not brought to the attention of the court during trial; (3) that the trial court answered a jury question during deliberations without notifying or consulting defense counsel; and (4) that the trial court failed to instruct the jury, in response to its question, that unreasonable provocation caused by heat of passion reduces first-degree murder to second-degree murder. Liberally construed, these

claims are sufficient to warrant a response from Respondent.

I.    Bail

Petitioner claims that the trial court denied bail at the preliminary hearing without just cause or explanation.  There is no absolute federal constitutional right to bail. *Kelly v. Springett*, 527 F.2d 1090, 1093 (9th Cir. 1975).  Once a state makes provision for bail, however, an accused has a Fourteenth Amendment due process right to have the state's bail system administered without caprice or discrimination. *Id.* The grant or denial of bail is within the sound discretion of a state trial court. *See id.* at 600-601.

In evaluating habeas petitions brought by state prisoners, a federal court does not sit in appellate review of a state court's exercise of judicial discretion in its grant or denial of bail. *Young v. Hubbard*, 673 F.2d 132, 134 (5th Cir. 1982).  The scope of habeas corpus review is limited to a test of the constitutionality of the denial. *Id.* Judgments of the state courts, when attacked collaterally through a federal habeas corpus petition, carry a presumption of regularity. *Finetti*, 609 F.2d at 600.  The federal petitioner bears the burden of overcoming the presumption of regularity by showing that there is no rational basis in the record for the denial of bail. *Id.*  Only if no rational basis for denying bail appears in the record will there be a violation of a state prisoner's constitutional rights. *Id.* at 595, 601.

Here, the seriousness of the charges of first-degree murder with a knife, and the lengthy sentence imposed, are a sufficient rational basis for denying a bail application. *See Young*, 673 F.2d at 134 (reasons for denying bail application are apparent in light of seriousness of three offenses and lengthy sentences imposed).  Accordingly, the presumption of regularity in the bail denial is not overcome and federal habeas relief is not warranted on the basis of the bail denial.

Petitioner also claims that the denial of bail led to his being appointed counsel,

instead of obtaining private counsel, and that appointed counsel was ineffective.  For the reasons discussed below, Petitioner has not shown that appointed counsel was ineffective.

II.     Ineffective Assistance of Trial Counsel

Petitioner claims that trial counsel was ineffective in failing to make motions for pre-trial psychiatric examinations or for the suppression of evidence, and failed to investigate diminished capacity and insanity defenses.

The Sixth Amendment guarantees the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  To prevail on a claim of ineffective assistance of counsel, Petitioner must show both that counsel's performance was deficient and that the deficient performance prejudiced Petitioner's defense.  *Id.* at 688.  To prove deficient performance, Petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms.  *Id.*  To prove counsel's performance was prejudicial, Petitioner must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.  A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as the result of the alleged deficiencies.  *See id.* at 697.

The record refutes Petitioner's complaint that counsel was ineffective in failing to move for pre-trial psychiatric examinations.  Petitioner had five mental evaluations by three different psychologists prior to trial to determine his competence. In four of these evaluations he was adjudged competent with medication, and one found him incompetent.  Petitioner's complaint that counsel failed to seek pre-trial psychiatric examinations is simply disproved by the record.

Petitioner claims that counsel was ineffective in failing to file a motion to suppress evidence, but he does not indicate what evidence should have been suppressed or on what grounds suppression was warranted.  As a result, there is no indication that counsel had any valid basis to file a suppression motion or that he was ineffective in failing to do so.

Petitioner's claim that counsel should have investigated a diminished capacity defense fails because California law abolished the defense of diminished capacity long before Petitioner's trial.  *See* Cal. Pen. Code § 25; *People v. Anderson*, 28 Cal. 4th 767, 783 (2002).

Lastly, Petitioner cannot show that counsel was ineffective in failing to investigate or present an insanity defense.  Defense counsel did investigate Petitioner's mental health by obtaining pre-trial mental health evaluations.  None of the experts who evaluated Petitioner found that he was insane at the time of the offense.  As a result, counsel did not have any evidence of insanity upon which to base an insanity defense.  More importantly, Petitioner asserted that he acted in self-defense.  That assertion contradicted an insanity defense insofar as it required Petitioner to prove that he acted reasonably in killing Hayes, while the insanity defense would have required him to prove that he did not understand his actions.  *See Turk v. White*, 116 F.3d 1264, 1266 (9th Cir. 1997).  The evidence about Petitioner's mental state obtained by counsel, as well as Petitioner's own account of the incident, did not give counsel a reasonable basis for pursuing an insanity defense.  Therefore, counsel's failure to further investigate or present an insanity defense was either deficient or prejudicial under *Strickland*.

Petitioner has submitted a notice of "evidence" of his "mental incompetence," which consists of the fact that he has been treated for mental illness in prison, and that before his prior arrest in 2002 he received "involuntary medication" for epileptic

seizures (dkt. 59).  The experts who examined him at the time of trial accounted for his medications in concluding that he was competent to stand trial, and they made no finding that he was insane at the time of his offense.  Petitioner's "notice" therefore does not change the conclusion that counsel was not ineffective with respect to pursuing or presenting evidence of Petitioner's mental incompetence and/or insanity.

The state courts' denial of Petitioner's claim of ineffective assistance of counsel was neither contrary to nor an unreasonable application of federal law. Accordingly, Petitioner is not entitled to habeas relief on this claim.

III.    Jury Question

Petitioner claims that the trial court answered a jury question during deliberations without notifying or consulting defense counsel.  Again, the record refutes Petitioner's claim.  At a hearing on July 19, 2011, defense counsel stated that he was notified about the question, and that he, the prosecutor and the trial court consulted about the question and the answer the court gave.  (Resp. Exh. 1 at 222-24; Exh. 2 at 1127-1128; Exh. 5.)  Accordingly, the record disproves Petitioner's claim that the trial court engaged in an ex parte communication with the jury without the presence of defense counsel.

Even if such an ex parte communication took place, moreover, it would not entitle Petitioner to habeas relief.  The Sixth Amendment guarantees those accused of a state or federal crime the effective assistance of counsel at trial.  *Strickland v. Washington*, 466 U.S. 668, 685 (1984).  In order to satisfy the Sixth Amendment, counsel must be present at all "critical stages" of the prosecution, absent an intelligent waiver by the defendant.  *United States v. Wade*, 388 U.S. 218, 226, 237 (1967); *United States v. Hamilton*, 391 F.3d 1066, 1070-71 (9th Cir. 2004) (critical stages under Sixth Amendment include arraignments, post-indictment identification lineups, hearing on pre-trial motion to suppress evidence, sentencing, court-ordered psychiatric

11

examinations to determine competency to stand trial and future dangerousness, the decision whether to plead guilty, and the process of plea bargaining and period of potential cooperation with the government)

The issue is whether or not the ex parte communication was a "critical stage" of Petitioner's trial at which defense counsel's presence was required.  Supreme Court case law and the trail record suggest that it was not.  Section 2254(d)(1) restricts the source of federal habeas relief to "clearly established federal law," meaning the decisions of the United States Supreme Court.  28 U.S.C. § 2254(d)(1).  The Supreme Court has not identified ex parte communications between juror and judge as a "critical stage" of trial.  To the contrary, it has acknowledged that the absence of defense counsel during an ex parte communication between a judge and a juror is not a structural error that would require automatic reversal.  *Rushen v. Spain*, 464 U.S. 114 (1983).  In *Rushen*, a juror went to the trial judge's chambers twice and told him that she was personally acquainted with the defendant's murder victim from a past homicide.  *Id.* at 116.  Defense counsel was not present at these meetings.  *Id.*  In denying the habeas claim, the Supreme Court held that, "[t]here is scarcely a lengthy trial in which one or more jurors do not have occasion to speak to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial."  *Id.* at 118-119.  The response to the juror's question during deliberations was the type that *Rushen* identified as a necessary "reality of courtroom life," and not one that necessarily requires defense counsel's presence.  *Id.*

In the absence of any Supreme Court authority suggesting that the ex parte communication between judge and juror in this case as a "critical stage" of the trial, the state court's denial this claim was neither contrary to, nor an unreasonable application of, "clearly established federal law" within the meaning of 28 U.S.C. § 2254(d)(1).  Consequently, federal habeas relief is not warranted on this claim.

IV.     Jury Instruction

Petitioner claims that the trial court failed to instruct the jury, in response to its question, that unreasonable provocation caused by heat of passion reduces first-degree murder to second-degree murder.

The California Court of Appeal summarized the jury instructions on this issue and the trial court's response to the jury's question.

> The jury was instructed with CALJIC No. 8.20 regarding deliberate and premeditated murder, which stated in part: "If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder in the first degree." Pursuant to CALJIC No. 8.30, the jury was instructed on the definition of second degree murder.

> The jury was also instructed with CALJIC No. 8.73, entitled "Evidence of Provocation May Be Considered in Determining Degree of Murder," which stated, "If the evidence establishes that there was provocation which played a part in inducing an unlawful killing of a human being, but the provocation was not sufficient to reduce the homicide to manslaughter, you should consider the provocation for the bearing it may have on whether the defendant killed with or without deliberation and premeditation."

> The jury was also instructed with CALJIC No. 8.42, entitled "Sudden Quarrel or Heat of Passion and Provocation Explained," which stated, "To reduce an intentional felonious homicide from the offense of murder to manslaughter upon the ground of sudden quarrel or heat of passion, the provocation must be of the character and degree as naturally would excite and arouse the passion, and the assailant must act under the influence of that sudden quarrel or heat of passion. [¶] The heat of passion which will reduce a homicide to manslaughter must be such a passion as naturally would be aroused in the mind of an ordinarily reasonable person in the same circumstances. A defendant is not permitted to set up his own standard of conduct and to justify or excuse himself because his passions were aroused unless the circumstances in which the defendant was placed and the facts that confronted him were such as also would have aroused the passion of the ordinarily reasonable person faced with the same situation. (Legally adequate provocation may occur in a short, or over a considerable, period of time.) [¶] The question to be answered is whether or not, at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from passion rather than from judgment. [¶] If there was provocation,

13

but of a nature not normally sufficient to arouse passion, or if sufficient time elapsed between the provocation and the fatal blow for passion to subside and reason to return, and if an unlawful killing of a human being followed the provocation and had all the elements of murder, as I have defined it, the mere fact of slight or remote provocation will not reduce the offense to manslaughter."

Pursuant to CALJIC No. 8.44, the jury was given the following instruction: "Neither fear, revenge, nor the emotion induced by and accompanying or following an intent to commit a felony, nor any or all of these emotional states, in and of themselves, constitutes the heat of passion referred to in the law of manslaughter. Any or all of these emotions may be involved in a heat of passion that causes judgment to give way to impulse and rashness. Also, any one or more of them may exist in the mind of a person who acts deliberately and from choice, whether that choice is reasonable or unreasonable."

On the first day of deliberations, the jury asked the court for an example of second degree murder. The court responded, "the court cannot give examples." The next day, the jury submitted the following written request: "Can heat of passion (CALJIC 8.44) be used in conjunction or construction with 2nd degree murder (CALJIC 8 .30)?" Both counsel were informed of the jury's question and were consulted before the court gave the jury its written answer to the jury's question. The court's written answer stated: "You have all of the jury instructions that apply to first degree murder, second degree murder or voluntary manslaughter. Please re-read those instructions carefully." Defense counsel neither objected to the court's answer nor requested any additional jury instructions.

*Collins*, 2012 WL  6116473 at *5-6.

The California Court of Appeal denied the claim based upon the following reasoning:

[W]e first review the law pertaining to the gradations of homicide culpability.

"First degree murder is an unlawful killing with malice aforethought, premeditation, and deliberation. [Citation.] Malice may be express (intent to kill) or implied (intentional commission of life-threatening act with conscious disregard for life). [Citation.] Second degree murder is an unlawful killing with malice, but without the elements of premeditation and deliberation which elevate the killing to first degree murder. [Citation.] To reduce a murder to second degree murder, premeditation and deliberation may be negated by heat of passion arising from provocation. [Citation.] If the provocation would not cause an average person to experience deadly passion but it precludes the defendant from subjectively deliberating or premeditating, the crime is second degree murder. [Citation.] If the provocation would cause a reasonable person to react with deadly passion, the defendant is deemed

14

to have acted without malice so as to further reduce the crime to voluntary manslaughter. [Citation.]" (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332, 107 Cal.Rptr.3d 915.) Stated differently, mitigation of murder to voluntary manslaughter requires a showing of objectively reasonable provocation or heat of passion (*People v. Steele* (2002) 27 Cal.4th 1230, 1254, 120 Cal.Rptr.2d 432, 47 P.3d 225 (*Steele* )), whereas, a subjective test applies as to whether provocation or heat of passion is sufficient to negate deliberation so as to reduce first degree murder to second degree murder (*People v. Valentine* (1946) 28 Cal.2d 121, 131–135, 169 P.2d 1; *People v. Padilla* (2002) 103 Cal.App.4th 675, 678, 126 Cal.Rptr.2d 889).

Appellant argues "it was probable that the jury applied the objective definition of heat of passion that can reduce murder to voluntary manslaughter instead of the subjective definition of heat of passion that can reduce first degree murder to second degree murder...." He asserts that because the jury was not instructed on the subjective definition of heat of passion, "defense counsel had a duty, once the jury expressed confusion over the correct definition, to request that the trial court define subjective heat of passion to prevent the jury from employing the incorrect legal definition of heat of passion."

In *People v. Fitzpatrick* (1992) 2 Cal.App.4th 1285, 1293–1294, 3 Cal.Rptr.2d 808, the defendant contended that CALJIC No. 8.73 fails to require the jury to consider inadequate provocation on the issue of the degree of murder and fails to specify the type of provocation that may negate premeditation and deliberation. The Court of Appeal concluded, "We believe that CALJIC No. 8.73 adequately deals with provocation sufficient only to reduce the degree of the murder. [Citation.]" (*Fitzpatrick*, at p. 1293, fn. 5, 3 Cal.Rptr.2d 808.) Thereafter, in *People v. Mayfield* (1997) 14 Cal.4th 668, 60 Cal.Rptr.2d 1, 928 P.2d 485, the defendant contended CALJIC No. 8.73 is ambiguous and fails to sufficiently specify the subjective factors the jury should consider in deciding how provocation bears on the elements of first and second degree murder. (*Mayfield*, at p. 778, 60 Cal.Rptr.2d 1, 928 P.2d 485.) *Citing Fitzpatrick*, the Supreme Court upheld the adequacy of CALJIC No. 8.73. (*Mayfield*, at ¶. 778–779, 60 Cal.Rptr.2d 1, 928 P.2d 485.) In *People v. Avila* (2009) 46 Cal.4th 680, 94 Cal.Rptr.3d 699, 208 P.3d 634, the Supreme Court impliedly upheld the adequacy of CALJIC No. 8.73, noting the instruction informs the jury that it can consider whether evidence of provocation not sufficient to reduce homicide to manslaughter has any bearing on whether the defendant killed with premeditation and deliberation. (*Avila*, at p. 707, 94 Cal.Rptr.3d 699, 208 P.3d 634.)

Here, in addition to CALJIC No. 8.73, the court instructed the jury with CALJIC No. 8.20, which expressly told the jury that for the killing to be first degree murder, it must not have been committed "under a sudden heat of passion or other condition precluding the idea of deliberation." (*See Steele*, *supra*, 27 Cal.4th at p. 1251, 120 Cal.Rptr.2d 432, 47 P.3d 225.) Taken together, the instructions given correctly and adequately informed the jury that it could consider whether evidence of

provocation was sufficient to reduce homicide to manslaughter, or if not, whether it had any bearing on whether the defendant killed with premeditation and deliberation. Since the instructions given were adequate and the parties were free to argue the subjective factors the jury could consider in evaluating the heat of passion evidence, defense counsel did not render ineffective representation in failing to object to the court's answer to the jury's question and in failing to request a clarifying instruction. (*See People v. Mendoza* (2000) 24 Cal.4th 130, 182, 99 Cal.Rptr.2d 485, 6 P.3d 150 [where instructions given are adequate, counsel is not ineffective in failing to request special instruction].)

*Collins*, 2011 WL 6116473 at *6-7.

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. *Id.* at 72. In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. *United States v. Frady*, 456 U.S. 152, 169 (1982)).

Petitioner claims that the trial court violated his right to due process by failing to instruct the jury, in response to its question, that unreasonable provocation caused by heat of passion reduces first-degree murder to second-degree murder. "When a jury makes explicit its difficulties, a trial judge should clear them away with concrete accuracy." *Bollenbach v. United States*, 326 U.S. 607, 612-13 (1946). When a trial judge responds to a jury question by directing its attention to constitutionally adequate jury instructions that answer its inquiry, and the jury asks no follow up question, a reviewing court may "presume[] that the jury fully understood the judge's answer and appropriately applied the jury instruction." *Waddington v. Sarausad*, 555 U.S. 179, 196 (2009).

Here, the trial judge responded to the jury's questions by directing its attention

to the jury instructions already given, and the jury asked no follow-up questions. Those instructions were constitutional insofar as they met the due process requirement of fairly and clearly explaining the difference between first and second degree murder and how reasonable provocation may reduce murder to manslaughter.  Furthermore — as explained by the California Court of Appeal — CALJIC No. 8.20 clearly states that there could not be first-degree murder if the killing was done in a heat of passion.  The instruction did not make any limitation that the heat of passion had to be brought on by reasonable provocation.  Therefore, on its face, it indicates that any heat of passion, even one brought on by an unreasonable provocation, would preclude a first-degree murder verdict.

As explained above, AEDPA only allows federal habeas relief if the state courts' decision was an unreasonable application of or contrary to federal law.  The state courts could reasonably determine that the jury instructions complied with due process by fairly and accurately explaining state law.  Given the constitutionality of these instructions, the trial court complied with due process when it responded to the jury questions by directing the jury back to the instructions.  As a result, the state courts' denial of Petitioner's claim was neither contrary to nor an unreasonable application of federal law, and he is not entitled to habeas relief on this claim.

## CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is DENIED. Petitioner's motion for appointment of counsel (dkt. 56) is DENIED because there is no need for an evidentiary hearing, Petitioner's claims were fairly presented without counsel, and there are no other circumstances necessitating the appointment of counsel.

A certificate of appealability will not issue.  *See* 28 U.S.C. § 2253 (c).  This is not a case in which "reasonable jurists would find the district court's assessment of the

constitutional claims debatable or wrong." *Slack v. Mcdaniel,* 529 U.S. 473, 484 (2000).

The Clerk shall enter judgment in favor of the Respondent and close the file.

**IT IS SO ORDERED.**

DATED:  December 10, 2015

_____
JEFFREY S. WHITE
United States District Judge

18